OPINION
{¶ 1} In cases numbered 5-07-26, 5-07-27, 5-07-28, 5-07-29, 5-07-30, 5-07-31, 5-07-32, and 5-07-33, Father-Appellant, Steven Robinson, and Mother-Appellant, Pamela Robinson (hereinafter Father and Mother jointly referred to as "Appellants"), appeal the judgment of the Hancock County Court of Common *Page 5 
Pleas, Juvenile Division, granting permanent custody of their children, respectively, Stephanie, Melanie, David, Skyler, Brittany, Kyle, April, and Travis, to the Hancock County Job and Family Services, Children Protective Services Unit (hereinafter referred to as "CPSU"). In this consolidated appeal, Appellants assert that the trial court erred in granting permanent custody to CPSU because it was not in the best interest of the children and because they were denied effective assistance of counsel. Based on the following, we affirm the judgments of the trial court.
 {¶ 2} In February 2006, CPSU filed complaints alleging that April (DOB: 3/20/1991), Travis (DOB: 3/24/1992), Kyle (DOB: 7/21/1993), Stephanie (DOB: 10/21/1994), Melanie (DOB: 11/24/1995), Skyler (DOB: 7/8/1999), Brittany (DOB: 10/22/2000), and David (DOB: 2/4/2003), (hereinafter April, Travis, Kyle, Stephanie, Melanie, Skyler, Brittany, and David collectively referred to as "the children")[1], were neglected and dependent because the family home was unsafe, unsanitary, and had been condemned. Additionally, CPSU requested ex-parte temporary custody of the children and appointment of a Guardian Ad Litem (hereinafter referred to as "the GAL"). The trial court granted both requests and the children were immediately placed in temporary custody of CPSU. *Page 6 
 {¶ 3} In April 2006, the trial court adjudicated the children neglected and dependent under R.C. 2151.03 and 2151.04 and ordered that the children remain in temporary custody of CPSU. Additionally, CPSU submitted a case plan, which the trial court approved. The case plan recommended that April, Travis, Kyle, Stephanie, Melanie, and Skyler be assessed to determine if they needed counseling; that Appellants undergo psychological evaluations to determine their parenting abilities; that Appellants enroll in a parent education program; that Appellants obtain and maintain a safe and clean living environment for the children; and, that Appellants obtain financial counseling to help them budget their money. Additionally, reunification of Appellants with the children was listed as the goal of the case plan.
 {¶ 4} In August 2006, the case came before the trial court for a semiannual review. The CPSU case progress review provided that Appellants made insufficient progress towards providing a safe and stable home for the children because they desired to move back into the family home, even though it was still condemned; that Appellants moved in with people who CPSU had not approved and that residence had no water; that Appellants continued to rely on community resources to supply their basic needs; that the children disclosed incidents of abuse while in their care; that Travis displayed delinquent behavior; and, that the children were socially and cognitively delayed. Additionally, the review provided *Page 7 
that April, Travis, Kyle, Stephanie, Melanie, Skyler, and Brittany had been placed in counseling by their foster parents and had made progress; that Appellants had been participating in a parent education program, but did not demonstrate an ability to utilize what they had learned during visitations; and, that Appellants had a difficult time expressing long term goals relevant to the case plan or understanding the CPSU involvement with their family.
 {¶ 5} In November 2006, CPSU moved for permanent custody of the children pursuant to R.C. 2151.353, 2151.413, and 2151.414.
 {¶ 6} In February 2007, the case again came before the trial court for a semiannual review. The CPSU case progress review provided that Father was incarcerated for forty-five days in October 2006; that Appellants were still unable to obtain housing with basic utilities and continued to rely on community resources for their own basic needs; that Appellants were evicted in November 2006 and moved in with Father's aunt; that the children disclosed incidents of further abuse while in their care; that Appellants had difficulty disciplining the children; that Mother completed her psychological evaluation in November 2006, but that Father did not complete his; that Appellants completed a parent education program, but did not demonstrate the ability to utilize what they had learned during visitations; that Appellants were unemployed and were unable to manage their finances; that Appellants were low-functioning and struggling to meet their *Page 8 
own basic needs; and, that Appellants had little interaction with the children during visits and still required supervised visitation.
 {¶ 7} In April 2007, the GAL filed a report recommending that the trial court grant CPSU permanent custody of the children because Appellants had failed to complete the requirements of their case plan and were incapable of adequately parenting the children; because there were no suitable family members to take custody of the children; and, because the children were well-adjusted to their foster homes, where they had been living since February 2006.
 {¶ 8} In June 2007, the case proceeded to a hearing where the following testimony was adduced.
 {¶ 9} Rebecca Shumaker, a parent educator for CPSU, testified that she was Appellants' parent educator from January 2006 until February 2007; that, when the children were initially removed from the home, Brittany was very dirty and had an extremely severe case of head lice, David was non-verbal, and Travis tried to run away; that she instructed Appellants on proper parenting and interaction before each visitation; that she observed the family during visitations and there was little interaction between Appellants and the children; that, during many visits, Father colored in a coloring book, played with toys, or did puzzles by himself; that she repeatedly told Father to talk with or play with the children rather than by himself, but he did not follow her instructions; that Mother typically sat *Page 9 
next to Father and would not initiate interaction with the children; that Appellants relied on the older children to take care of the younger children; that the children did not seem bonded to Appellants; that, despite working with Appellants for one year, "there was very little progress" so she closed the case as unsuccessful (hearing tr., vol. I, p. 23); and, that, based on her observations, Appellants cannot adequately parent the children and further parent education would not be beneficial.
 {¶ 10} Drew Mihalik, the court-appointed attorney for Travis, Kyle, and Brittany, testified that Travis, Kyle, and Brittany expressed a desire to return to Appellants' home.
 {¶ 11} Holly Wise, Skyler's teacher during the 2005-2006 school year, testified that, before moving to a foster home, Skyler "seemed very sad[,] * * * school was hard for him," and he rarely spoke and was often dressed inappropriately (hearing tr., vol. II, p. 66); and, that, after moving to a foster home, "Skyler seemed like a new boy," and was talkative, well kept, happy, and engaged more in academics. (Hearing Tr., vol. II, pp. 67-70).
 {¶ 12} William Brooks, Stephanie and Melanie's school principal, testified that, before moving to a foster home, both girls were very quiet, unkempt, and rarely smiled, but that, after moving to a foster home, the girls changed *Page 10 
dramatically and their social skills, appearance, cleanliness, and overall disposition improved.
 {¶ 13} Carrie Rashleigh, a case manager at the Harmony House visitation center, testified that Appellants visited with the children for two hours once a week from June 2006 until the time of trial; that, during most of the visits she monitored, "interaction between [Mother] and [Father] and the children was quite minimal and so was any kind of discipline or correction" (hearing tr., vol. II, p. 82); that Father typically colored or read books by himself during visitations; that April did more parenting than either Father or Mother during visitations; and, that Appellants made no significant improvements in their parenting ability.
 {¶ 14} Robin Brown, a therapist, testified that Appellants were referred to her for mental health diagnostic assessment; that Appellants suffered from adjustment orders and depression; that Mother began attending a group program called Living Skills Group which focused on relationships, financial management, substance abuse, and anger issues; that the Living Skills Group program required completion of a workbook; that she twice offered Appellants assistance with completing their workbooks, which they refused; that Mother attended the Living Skills Group and Father attended two individual sessions, but they did not successfully complete the program because they did not turn in their workbooks on time; that Appellants did not seem to understand their finances or that they *Page 11 
were homeless, living without utilities, and allowing inappropriate people to live with them; that she told Appellants about a process by which they could get financial assistance for housing, but she is not sure if they went through the process; that some of the mental health treatment goals were met because Mother attended the Living Skills Group and Father attended some individual sessions, but that "there's a difference between attending appointments and learning something and trying to incorporate it into your life" (hearing tr., vol. II, p. 137); and, that, even after working with them, she believed that Appellants would continue to have problems maintaining housing and basic living skills for themselves.
 {¶ 15} Amy Gillig, CPSU's social worker assigned to the cases, testified that she worked with the family from August 2006 until the time of trial; that she conducted home visits once a month; that Appellants were limited in their functioning; that Appellants did not successfully complete the case plan requirement of mental health treatment because, although they both underwent psychological evaluations, they did not turn in their workbooks; that Appellants did not complete the parent education requirement of their case plan because they did not follow the recommendations of the parent educator and did not display appropriate parenting during visitations; that Appellants did not complete the case plan requirement of obtaining and maintaining safe and stable housing because they were evicted from one apartment for not paying rent, their current home had *Page 12 
no doors to the bedrooms or bathroom, and the floors and stairway were very unstable; that Appellants did not complete the case plan requirement of financial management because they did not seek budget counseling, both were unemployed, their only income was $650 from social security per month, and they had not been paying their bills on time; that none of the visitations she observed were appropriate because Appellants did not display appropriate parenting; that, overall, CPSU provided Appellants with parent education, case management, diagnostics, therapeutic services, transportation, utility payment assistance, psychological services, and information referral, but that they were still unable to provide an adequate home for the children, and would not be able to within one year; that Appellants had not made any substantial changes in their lifestyle; that the grant of permanent custody to CPSU was in the best interest of the children; that the children had no appropriate family members to adopt them; and, that Appellants had continuously and repeatedly failed to remedy the conditions causing the children to be removed from their home.
 {¶ 16} Further, Gillig testified that all of the children need legally secure and permanent placement; that April has a peer relationship with Appellants rather than a parent/child relationship, is on an individualized educational plan (hereinafter referred to as "IEP"), has progressed academically since moving to a foster home, gets along with her foster mother, and likes living in the foster home; *Page 13 
that Travis does not have much of a relationship with Appellants, is on an IEP, has progressed academically and behaviorally since moving to a foster home, and has a good relationship with his foster father; that Kyle has a peer relationship with Appellants rather than a parent/child relationship, is on an IEP, and likes living in the foster home; that Stephanie does not have much interaction with Appellants, is on an IEP, has been more upbeat and talkative since moving to a foster home, and does not want to leave her foster home; that Melanie has a distant relationship with Appellants, is on an IEP, likes living in the foster home, and has been thriving academically and socially since moving to the foster home; that Skyler does not have much interaction with Appellants, had seven teeth pulled due to lack of dental care prior to moving to the foster home, is on an IEP, and has progressed developmentally since moving to a foster home; that Brittany does not have much interaction with Appellants, is on an IEP, has fewer speech problems since moving to a foster home, and likes her foster parents; and, that David does not have much interaction with Appellants, is on an IEP, is developmentally delayed, has serious dental problems, has not been toilet trained, and considers his foster parents to be his parents.
 {¶ 17} Dr. David Connell, a psychologist, testified that, upon CPSU's referral, he conducted psychological evaluations of Appellants to determine their parenting abilities; that he observed the family during visitations and found that *Page 14 
Appellants lacked appropriate physical and verbal interaction with the children; that, during the evaluations, he posed questions in short sentences to accommodate Appellants, but that he did not think they understood; that Father is mildly retarded with an IQ of fifty-four and has a generalized anxiety disorder with specific phobias, post-traumatic stress disorder, and personality disorder with antisocial traits; that Father exhibits unrealistic expectations for the children and does not understand age appropriateness; and, that Father lacks the skills necessary to adequately parent the children and this is unlikely to change.
 {¶ 18} Further, Dr. Connell testified that Mother has a codependent relationship with Father, which causes her to choose him over the children; that Mother is mildly mentally retarded with an IQ of fifty and has an anxiety disorder with specific phobias; that Mother is unable to maintain employment; and, that Mother does not have the ability to be an effective parent and this is unlikely to change.
 {¶ 19} Mary Oakes, the children's Court Appointed Special Advocate (hereinafter referred to as "CASA"), testified that she worked with the family from November 2006 until the time of trial; that Appellants do not have a close relationship with the children and there is little interaction between them; that Appellants' home is inappropriate for children; that Travis, Brittany, and David are placed together in a foster home, Stephanie, Melanie, and Skyler are in another *Page 15 
home, and April and Kyle are in a third home; that, since moving to foster homes, the children have improved academically, socially, and physically; that all of the children look more robust, healthier, and are more confident and talkative; that
David and Brittany are not old enough to understand the issues, but seem happy in their foster homes; that April, Travis, Kyle, Stephanie, Melanie, and Skyler all expressed a desire to stay in their foster homes; and, that, at one time, Travis and Kyle expressed a desire to return to Appellants' home. Further, Oakes recommended that permanent custody of the children be granted to CPSU.
 {¶ 20} In July 2007, the trial court granted permanent custody of the children to CPSU and approved a case amendment whereby the goal was changed from reunification to adoption. In the trial court's judgment entries[2] granting CPSU permanent custody of the children, the trial court listed the following findings of fact:
 3. The Court finds by clear and convincing evidence that it would be in the best interest of the [children] to grant [their] permanent custody to CPSU and further finds that the [children] cannot be placed with either parent within a reasonable time or should not be placed with the [children's] parents pursuant to Section 2151.414(B)(1)(a) of the Revised Code.
 4. In determining the best interest of the [children], the Court has considered all relevant factors included in Section 2151.414(D)(1) through (5), and Section 2151.414(E)(7) to *Page 16 
 (11) of the Revised Code, the Court has considered the relationship of the [children] with [their] parents, relatives, foster parents, out-of-home providers and other people who may significantly affect the [children's] need for legally secure permanent placement and the probability that this type of placement can be achieved only through the granting of permanent custody to [CPSU]. The Court has further considered the mental retardation of the parents and the effect the retardation has had on their ability to manage their own lives and to parent their [children], the custodial history of the [children] along with the wishes of the [children] as expressed personally to the Court and by way of recommendation from their CASA.
 5. In determining that the [children] cannot or should not be placed with the parents within a reasonable time, this Court finds that Revised Code Section 2151.414(E)(1) has been proven by clear and convincing evidence to exist. Particularly, this Court finds that following the placement of the [children] outside [their] home and, not withstanding reasonable cause [sic] planning and diligent efforts by [CPSU] to assist the parents to remedy the problems that initially caused the [children] to be placed in foster care, the parents have failed continuously and repeatedly to substantially remedy the conditions which caused said [children] to originally be placed in care on February 3, 2006. In determining these factors, the Court has considered parental utilization of social and rehabilitative services and material resources that were made available to the parents with the purpose of changing their conduct to allow them to assume and maintain parental duties. The Court further finds that the parents have mental retardation, Generalized Anxiety Disorder with Specific Phobias and a Personality Disorder with Dependent and Antisocial traits so severe that it makes the parents unable to provide an adequate permanent home for the [children] at the present time and, as anticipated, within one year after the Court holds the hearing in this matter. The parents have demonstrated a lack of commitment toward the [children] by showing an unwillingness to provide an adequate permanent home for *Page 17 the [children] that would prevent the [children] from suffering physical, emotional, or sexual abuse or neglect. The parents have further shown their inability to handle their finances and their unwillingness to seek or accept help offered to them regarding their health, finances, or housing. The Court further finds, from a personal viewing of the parties [sic] current residence, that it would be unsuitable and unsafe for even one individual to reside [there] let alone a family of ten.
 6. The Court further finds by clear and convincing evidence that continuation in the [children's] own home would be contrary to [their] welfare.
(July 2007 Journal Entry, pp. 2-3).
 {¶ 21} It is from these judgments that Appellants appeal, presenting the following assignments of error for our review.
 Assignment of Error No. I THE TRIAL COURT ERRED WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT THE AWARD OF PERMANENT CUSTODY TO THE HANCOCK COUNTY JOB FAMILY SERVICES: CHILDREN'S PROTECTIVE SERVICES UNIT WAS IN THE BEST INTEREST OF THE MINOR CHILDREN.
 Assignment of Error No. II APPELLANTS STEVE AND PAMELA ROBINSON WERE DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN THIS CASE, AND COUNSEL'S ERRORS WERE SO FUNDAMENTAL AS TO PREJUDICE THE AWARD OF PERMANENT CUSTODY.
 Assignment of Error No. I *Page 18 {¶ 22} In their first assignment of error, Appellants contend that the trial court erred when it found that granting CPSU permanent custody of the children was in the children's best interest. Specifically, Appellants assert that they attempted to comply with the case plan and timely completed all but one minor portion of the case plan requirements for mental health treatment and parent education; that at least three of the children wished to return to them; that all of the children expressed regret and sadness at the prospect of not returning home to them; and, that they were not incarcerated, had not been convicted of any child-related crimes, had not abused the children, and had not intentionally withheld medical treatment or food when they had means to provide it. We disagree.
 {¶ 23} Our review of a grant of permanent custody begins by noting that "[i]t is well recognized that the right to raise a child is an `essential' and `basic' civil right." In re Hayes (1997),79 Ohio St.3d 46, 48, citing In re Murray (1990), 52 Ohio St.3d 155, 157. Parents have a fundamental liberty interest in the care, custody, and upbringing of their children. Murray, 52 Ohio St.3d at 157; Santosky v. Kramer (1982),455 U.S. 745, 753. However, a natural parent's rights are not absolute.In re Thomas, 3d Dist. No. 5-03-08, 2003-Ohio-5885, ¶ 7. "It is plain that the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." In re Cunningham (1979),59 Ohio St.2d 100, 106 (citation omitted). *Page 19 
 {¶ 24} Permanent custody determinations made under R.C. 2151.414 must be supported by clear and convincing evidence. In re Baby Girl Doe,149 Ohio App.3d 717, 738, 2002-Ohio-4470, citing In re Hiatt (1993),86 Ohio App.3d 716, 725. Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."In re Estate of Haynes (1986), 25 Ohio St.3d 101, 104. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Cross v. Ledford (1954),161 Ohio St. 469, 477, citing Ford v. Osborne (1887), 115 Ohio St. 11. Thus, we are required to determine whether the trial court's determination was supported by sufficient credible evidence to satisfy the requisite degree of proof, In re McCann, 12th Dist. No. CA2003-02-017,2004-Ohio-283, ¶ 12, citing In re Starkey, 150 Ohio App.3d 612, 617,2002-Ohio-6892, and, absent an abuse of discretion, the trial court's decision must be upheld. In re Robison, 3d Dist. No. 5-07-41,2008-Ohio-516, ¶ 8, citing Masters v. Masters (1994), 69 Ohio St.3d 83,85; see, also In re Rinaldi, 3d Dist. No. 1-02-74, 2003-Ohio-2562. An abuse *Page 20 
of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id.
 {¶ 25} "Once a child has been adjudicated dependent, neglected, or abused and temporary custody has been granted to a children services agency, the agency may file a motion for permanent custody under R.C. 2151.415(A)(4)." In re Esparza, 3d Dist. Nos. 9-06-25 9-06-27,2007-Ohio-113, ¶ 25. The trial court's analysis consists of two prongs. First, the trial court must determine if any conditions enumerated in R.C. 2151.414(B)(1) are present. If any of these conditions exist, the trial court must then move on to the second prong and determine whether permanent custody is in the best interest of the child.
 {¶ 26} The first prong of the analysis requires consideration of R.C.2151.414(B)(1), which contains the pertinent conditions, and states, in part:
 [T]he court may grant permanent custody of a child to a movant if the court determines at the hearing * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more *Page 21 months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 27} After finding that one of the R.C. 2151.414(B)(1) conditions is present, the trial court is then required to move to the second prong of the analysis and determine by clear and convincing evidence that permanent custody is in the child's best interest. In determining whether it is in the child's best interest to grant permanent custody to the agency, R.C. 2151.414 directs the trial court to consider the following non-exclusive factors:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's [GAL], with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
R.C. 2151.414(D). Additionally, the factors referred to in subsection five concern whether the parent has abused the child or intentionally withheld food or medical care from the child. See R.C.2151.414(E)(7),(8). *Page 22 
 {¶ 28} Here, Appellants assert that they attempted to comply with the case plan and that they did not abuse the children or intentionally withhold food or medical care. However, abuse of the child or intentional withholding of food or medical care are only two non-exclusive factors for the trial court to consider in determining the best interest of the child under R.C. 2151.414(D). Additionally, testimony was presented that Appellants refused assistance in completing their mental health treatment and obtaining housing; that they did not make any substantial changes in their lifestyle; that they did not successfully complete the parent education program as required by the case plan; that they did not complete financial counseling as required by the case plan; that they did not obtain suitable housing as required by the case plan and would not be able to within one year, despite the availability of social services and material resources; that, although they completed some of the mental health objectives required by the case plan, they still did not understand the consequences of their homelessness or living with people who endangered the children; and, that they are mentally retarded and have generalized anxiety disorders with phobias and personality disorders with dependent and antisocial traits so severe that they do not and will never have the ability to be effective parents. Accordingly, we find that this constitutes clear and convincing evidence supporting permanent custody and that the trial court did not *Page 23 
abuse its discretion in finding that the children could not or should not be placed with Appellants within a reasonable time.
 {¶ 29} Additionally, Appellants contend that some of the children wished to return home and all expressed sadness at the prospect of not returning home. However, testimony was presented that none of the children had a close relationship with Appellants; that there was little interaction between the children and Appellants during visits; that the children improved academically, socially, and physically since moving into foster homes; that April, Travis, Kyle, Stephanie, Melanie, and Skyler all expressed a desire to stay in their foster homes, even though Travis and Kyle had, at one time, expressed a desire to return to Appellants; that David and Brittany were not old enough to understand the issues, but appeared happy in their foster homes; and, that the children needed a legally secure permanent placement. Therefore, we find that the trial court did not abuse its discretion in finding that it was in the children's best interest to grant permanent custody to CPSU.
 {¶ 30} Accordingly, we overrule Appellants' first assignment of error.Assignment of Error No. II
 {¶ 31} In their second assignment of error, Appellants contend that they were denied effective assistance of counsel and counsel's errors were so numerous as to prejudice CPSU's award of permanent custody. Specifically, Appellants *Page 24 
assert that trial counsel erred by not offering witnesses on their behalf because they provided trial counsel with the names and addresses of family members who were willing to testify in contradiction of CPSU's allegations; that trial counsel erred by not offering exhibits on their behalf; that trial counsel was ill-prepared for the hearing, preventing a fair hearing and reliable result; and, that trial counsel was so deficient that a reversal of the grant of permanent custody is warranted.
 {¶ 32} R.C. 2151.352 provides parents with a right to counsel in proceedings to terminate parental rights. Additionally, "`[w]here the proceeding contemplates the loss of parents' "essential" and "basic" civil rights to raise their children, * * * the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody.'" In re Shrider, 3d Dist. No. 16-05-20,2006-Ohio-2792, ¶ 37, quoting In re Heston (1998), 129 Ohio App.3d 825,827. Therefore, the right to counsel in proceedings to terminate parental rights includes the right to the effective assistance of counsel. Shrider, supra.
 {¶ 33} In determining claims of ineffective assistance of counsel in criminal prosecutions, the Supreme Court of Ohio utilizes a two prong test. See State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. "[Appellant] must first show that his attorney's performance `fell below an objective standard of reasonableness,' and must then show that `there is a *Page 25 
reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v.Jones, 3d Dist. No. 02-2000-07, 2000-Ohio-1879, quoting Strickland v.Washington (1984), 466 U.S. 668, 694. In the first prong of the test, courts must provide a high level of deference to trial counsel's performance. Bradley, 42 Ohio St.3d at 142. In the second prong of the test, reasonable probability requires a probability sufficient to undermine confidence in the trial's outcome. Id.
 {¶ 34} "The decision whether to call a witness is `within the rubric of trial strategy and will not be second-guessed by a reviewing court.'"In re Walker (2005), 3d Dist. Nos. 5-05-22 5-05-23, 2005 WL 3359125, ¶ 14, quoting State v. Williams, 99 Ohio St.3d 493, 2003-Ohio-4396. Here, the record provides no evidence supporting a claim that declining to call Appellants' family members or other witnesses was not sound trial strategy. Additionally, although Appellants assert that their family members' testimony would have been in their favor, this claim is unsubstantiated by the record, and thus, they have demonstrated no reasonable probability that calling these witnesses would have changed the outcome of the proceeding. Therefore, trial counsel was not ineffective for declining to call witnesses on Appellants' behalf. SeeState v. Martin, 2d Dist. No. 20610, 2005-Ohio-1369, ¶ 19. *Page 26 
 {¶ 35} Regarding trial counsel's decision not to present exhibits, Appellants offer no proposals as to what exhibits could have been presented on their behalf Additionally, no potential exhibits are apparent from the record. See State v. Bowens (1991), 11th Dist. No. 89-A-1463, 1991 WL155228. Further, we note that the trial court's decision to grant CPSU permanent custody of the children was supported by a substantial amount of evidence and appellants demonstrated no reasonable probability that presenting exhibits would have changed the outcome of the proceeding. Therefore, trial counsel was not ineffective for declining to present exhibits on Appellants' behalf.
 {¶ 36} Finally, we find Appellants' contention that trial counsel was ill-prepared for the hearing to be uncorroborated. The record reflects that trial counsel objected numerous times to testimony and exhibits offered by CPSU and cross-examined all but one of CPSU's witnesses. Therefore, Appellants have not demonstrated that trial counsel was ill-prepared.
 {¶ 37} Accordingly, we overrule Appellants' second assignment of error.
 {¶ 38} Having found no error prejudicial to the appellants herein, in the particulars assigned and argued, we affirm the judgments of the trial court.
Judgments affirmed.
 PRESTON and WILLAMOWSKI, JJ., concur.
[1] All of the children have the last name Robinson, with the exception of April. April's last name is her mother's maiden name, Ray, because she was born before Appellants married.
[2] A separate judgment entry was issued for each child and they are virtually identical; however, the judgment entries regarding Travis, Kyle, and Brittany disclose that these children were represented by court-appointed attorney Drew Mihalik in addition to CASA Mary Oakes. *Page 1