[Cite as *In re L.J.*, 2009-Ohio-5658.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

**IN THE MATTER OF:**

    **L.J.,**
                                                **CASE NO. 8-09-07**

**DEPENDENT CHILD,**

**[KENNETH JOHNSON, SR., APPELLANT,**
**MARIA JOHNSON, APPELLANT],**
                                        **O P I N I O N**

**[ASHLEY NICOLE JOHNSON, APPELLANT],**

**[KENNETH JOHNSON, JR., APPELLANT].**

**Appeal from Logan County Common Pleas Court,**
**Juvenile Division**
**Trial Court No. 07-CS-0028**

**Judgment Affirmed**

**Date of Decision:   October 26, 2009**

**APPEARANCES:**

    *Bridget D. Hawkins*  **for Appellant**

    *Deborah K. Wolf*  **for Appellee**

    *Linda MacGillivray,* **Guardian Ad Litem**

**WILLAMOWSKI, J.,**

{¶1} Appellants Kenny Johnson Jr. ("Kenny") and Maria and Kenny Johnson Sr. ("the Johnsons") bring appeals from the judgment of the Court of Common Pleas of Logan County, Juvenile Division, terminating the parental rights of Kenny and awarding permanent custody of L.J. to appellee Logan County Children Services Board ("LCCSB"). For the reasons set forth below, the judgment is affirmed.

{¶2} L.J. was born to Kenny and Ashley Johnson ("Ashley") on April 17, 2007. LCCSB was contacted by the hospital when concerns arose about Ashley's parenting ability. On April 18, 2007, LCCSB filed a complaint alleging that L.J. was a dependent child and requesting temporary custody. LCCSB also filed a motion requesting emergency temporary custody. This motion was granted that same day. A hearing was held on the emergency motion on April 20, 2007. The parents agreed at the hearing to temporary custody pending an adjudicatory hearing. The trial court thus entered an order continuing LCCSB's temporary custody of L.J.. On May 18, 2007, the first proposed case plan was filed with the trial court. This plan required that 1) Kenny and Ashley to obtain services through the Logan County Board of Mental Retardation and Development Disabilities ("MRDD") in order to learn independent living skills; 2) Kenny and Ashley would learn to resolve their disputes without police involvement by obtaining counseling;

and 3) Kenny and Ashley would take parenting classes and apply what they learned in those classes. The adjudicatory hearing was held on June 4, 2007. At the hearing, the parents consented to a finding that L.J. was a dependent child, but no agreement was reached as to disposition. The dispositional hearing was then held on July 13, 2007. The trial court entered its judgment on July 26, 2007, awarding temporary custody of L.J. to LCCSB and approving the May 18, 2007, case plan.

{¶3} On October 18, 2007, the first semi-annual review of the case plan was held. The review indicated that Kenny and Ashley were receiving services from MR/DD and were learning budgeting skills. The pair had no reported domestic incidents and had fewer calls to the police to help resolve their disputes. The review also indicated that although Kenny and Ashley cooperated with service providers, they did not always follow the instructions of the service providers. Finally, the review indicated that Kenny and Ashley had begun parenting classes. The conclusion was that although some progress had been made in all areas, additional services were needed. This review was filed with the trial court on October 24, 2007.

{¶4} On December 6, 2007, LCCSB filed a request for an extension of temporary custody with the current case plan. This motion was granted on

Case No. 8-09-07

January 18, 2008. A case plan review was conducted on January 18, 2008. The review indicated the following concerns.

> **Kenny and Ashley have service providers involved with them to assist in working with their cognitive and mental health disabilities. Ashley has a legal guardian who assists with her decision making processes, as she was determined to be incompetent. Budgeting and daily living skills are also provided to Kenny and Ashley through MRDD. In the past Kenny and Ashley's relationship has consisted of problems with domestic incidents, substance abuse issues with Kenny, and concerns with parenting practices. Ashley's older daughter is placed in the legal custody of a relative. There is turmoil between Kenny and Ashley and their extended family members and this has also created much chaos in their lives.**
>
> **[L.J.] has not been in Kenny and Ashley's custody since her birth. They recently moved into a new place and there are physical hazards that would be concerns, if [L.J.] would be in the home.**

Jan. 18, 2008, Case Review, 4. This review was filed with the trial court on January 24, 2008. On January 22, 2008, LCCSB filed a motion for permanent custody pursuant to R.C. 2151.414(E)(1-4). On February 22, 2008, the Johnsons filed a motion for custody of L.J.

{¶5} On April 7, 2008, the annual case plan review was conducted. The review summary stated as follows.

> **Kenny and Ashley have worked cooperatively with most of the service providers involved with them. On January 9, 2008, Ashley started working at RTC. Kenny and Ashley made the decision on their own to move into a trailer, which repairs have been made and repairs are still being done to the trailer. The potential safety risks that this home environment has posed to a**

-4-

**child have been significant at times, including improper wiring and heating concerns, the floor not being stable, and the bathroom wall being removed.**

**\* \* On December 5, 2007, Kenny and Ashley attended an appointment with Carl Newcomer at Consolidated Care to start marital counseling.  During the counseling session, Carl Newcomer reported that he discussed with Kenny and Ashley about a marital confrontation that they had over the previous weekend.  Carl Newcomer also reported that Kenny and Ashley said that they had been arguing and Kenny called law enforcement on Ashley.  Carl Newcomer stated that Ashley admitted that she still has problems with anger.  Carl Newcomer reported that there still seems to be continual conflict between Kenny and Ashley.  On December 17, 2007, Kenny and Ashley did not attend a scheduled appointment with Carl Newcomer.  It appears that Kenny and Ashley have not attended any additional appointments with Carl Newcomer.  On March 20, 2008, Ashley stated that she would not sign an Authorization for Exchange of Information for Consolidated Care.  On March 24, 2008, Kenny and Ashley got into an argument and law enforcement was called to their home.  Ashley has been living separately from Kenny since this incident.**

**\* \* Kenny and Ashley met with Kit Wehe from Help Me Grow to discuss the services that Help Me Grow offers to families.  No other services have been provided from Help Me Grow at this time.  Kenny and Ashley attended and participated in the parenting evaluation, which was completed by Carl Newcomer at Consolidated Care.**

April 7, 2008, Annual Review, 1-2.  Another semi-annual review was completed on April 18, 2008, and filed with the trial court on April 24, 2008.  This review noted that Kenny and Ashley struggle to understand L.J.'s needs and cope with

them during visits. The next review was completed on July 11, 2008, and filed on July 14, 2008. No progress had been noted from the prior review.

{¶6} On July 17, 2008, the Guardian Ad Litem, Linda MacGillivray ("MacGillivray"), filed her report. In her opinion, Kenny and Ashley lacked sufficient mental functions and ability to care for L.J. She noted that the Johnsons had a history with social services agencies and that they were "often harsh and inappropriate in their parenting skills." GAL Report, 2. Based upon her opinion that L.J. had bonded with her foster parents, who wished to adopt her, the GAL recommended granting permanent custody to LCCSB.

{¶7} On July 24 and 25, 2008, the permanent custody hearing was held. LCCSB presented the testimony of nine witnesses. Jennifer Meyer ("Meyer") was the original case worker who developed the case plan with Kenny and Ashley. Meyer testified that the trailer to which Kenny and Ashley moved was in a state of disrepair. Tr. 33. There were safety concerns due to exposed wires, a buckling floor, lack of water at times, and a wall furnace without a guard. Tr. 34. Kenny was very attentive at visits and took instruction well. Tr. 35. Meyer testified that progress on the case plan was minimal. Tr. 37. "They would start to do something, but then never really got completed to the degree it needed to be." Id. Ashley and Kenny were inconsistent in attending counseling appointments. Id. They did not like having providers be in charge of their money. Id. Ashley

and Kenny frequently resolved arguments by calling the police because they lacked the skills to resolve the conflict for themselves. Tr. 39. Ashley and Kenny also had problems with transportation because neither of them has a driver's license. Tr. 42. Kenny attended almost all of his visits. Tr. 47. Meyer also testified that she had no concerns about the Johnsons based upon her observations of them during visits with L.J. Tr. 49. However, the home evaluation recommended denying custody to the Johnsons. Tr. 54. In her opinion, it would be in L.J.'s best interest to grant permanent custody to LCCSB. Tr. 57.

{¶8} Amanda Willis ("Amanda") took over L.J.'s case on December 21, 2007, when Meyer left LCCSB. Amanda testified that Kenny had not consistently attended counseling as required by the case plan and had only attended two out of the six scheduled appointments in the six months prior to the hearing. Tr. 71. As of April 2008, Kenny was no longer employed. Id. She stated that there were several safety concerns about Ashley and Kenny's residence due to the perpetual state of construction. Tr. 73. She also testified that Ashley and Kenny have some personal hygiene issues. Tr. 74. Based upon her observations, there has been minimal progress on the case plan objectives and the risk level has actually increased from high risk to intensive risk. Tr. 81-82. Amanda testified that it would be in L.J.'s best interest to grant permanent custody to LCCSB. Tr. 82. On cross-examination, Amanda did admit that the

safety issues in the home had been remedied. Tr. 84-85. She also admitted that Kenny does well with L.J. and there were no concerns about his parenting skills. Tr. 89. Finally, Amanda admitted during cross-examination that Kenny had completed everything under the case plan that could make a difference. Tr. 91.

{¶9} When discussing the Johnsons, Amanda testified that they have attended all visits and acted appropriately. Tr. 77-78. There were no negative references to the Johnson's behavior with L.J. in the notes, which, in fact, contained several positives. Tr. 91. Amanda testified that since the Johnsons' original home study was denied, they could no longer be considered regardless of any changes that were made to the home. Tr. 93.

{¶10} Rodney Willis ("Rodney") is employed as a case manager with MR/DD, and works with Kenny. He began working with Kenny in 2004. Tr. 133. Kenny uses the agency for payeeship, but has not accessed home maker services or anything else to maintain independent living. Id. Kenny did not wish to use these services because he wanted to be independent. Tr. 134. Kenny did not fully cooperate with his direct care provider. Id. Kenny had been employed by Heritage Court in the maintenance department for 8-9 years until the new owners cut his position due to budget constraints. Tr. 135. Rodney also testified that Kenny could work through RTC, but does not want to do so. Id. When discussing the residences, Rodney testified that in his opinion Kenny's home

would not be appropriate for a child. Tr. 141. Kenny and Ashley had problems dealing with each other. Tr. 143. Kenny has not always followed Rodney's recommendations. Tr. 146. In his opinion, Rodney believes that Kenny's decisions "have been made in ways that can jeopardize his health and safety." Id. He did not believe that Kenny would be able to follow the recommendations made by service providers. Tr. 147. When questioned about his contact with the Johnsons, Rodney testified that he had no problems with them. Tr. 150-51. The assessments have shown that Kenny has an IQ of approximately 45. Tr. 152.

{¶11} Elizabeth McClure ("McClure") was an in-home caseworker for LCCSB. She was responsible for completing the home study evaluations. Tr. 195. She testified that they did not recommend placing L.J. with the Johnsons due to the strained relationships between Kenny and Ashley and the Johnsons. Tr. 196. She also testified that the Johnsons had previously been involved with LCCSB and were not cooperative with service providers in the past. Id. The home was clean, but was small, dark and "gloomy." Tr. 197. Although the Johnsons are "making ends meet," they do not have much discretionary income. Id. McClure also testified that she did not believe the home was appropriate for a child because it was very small and full of stuff. Tr. 200. The only issue with the Johnson's home safety audit was that there was no fire extinguisher. Tr. 206.

{¶12}  The next witness for LCCSB was MacGillivray.  She testified that it would be in L.J.'s best interest to grant permanent custody to LCCSB.

> **I do not believe any of the movants or the parents are capable of bringing her to a safe, healthy, happy, productive adulthood.  I can elaborate on that in a minute.**
>
> **She has bonded very well to her foster family.  She knows them as mother and father.  She knows no one else as her mother and father.  Although she visits with them, I have seen a few of the visits, Kenny is somewhat bonded to [L.J.].  I question that Ashley has ever bonded with [L.J.].  And certainly [L.J.] has not bonded with them as being her parents.**
>
> **\* \* \***
>
> **Secondly, the home conditions at all of the homes are questionable at best.  However, if they all lived in the Tajmahal, my opinion would still be the same.  But they don't.  The home conditions are questionable.  Their stability is questionable at best.  Various parties have moved.  I don't believe any of them are employed.  Most are on Social Security because of mental deficiencies.  And in the case of Kenny and Ashley, their mental deficiencies are to the point no amount of services are going to change that.**
>
> **I feel this is a very, very sad case.  However I don't believe they are ever going to raise (sic) to the level of being able to care for a child.  They have been found repeatedly by the courts to not be able to care for themselves.**
>
> **If they had a stable marriage relationship, that would help.  But they do not.  But they have been separated on and off in just this past year.  There were difficulties before that.**
>
> **We have seen no progress, in fact it has only gotten worse.**
>
> **\* \***

> **When [the Johnsons] were appointed an attorney, he requested, by leaving a message at my office, he would like for me to do a home visit with them. Which I did a couple of weeks ago.**
>
> **It was in July. Mark is still living there. I made my scheduled home visit at 9:30. Mark never got out of bed. There is a curtain on his bedroom door. He could hear me. He didn't get out of bed to meet me. You have to walk through the parent's bedroom to get to the kitchen in the back part of the house. I didn't (sic) recall seeing a door on any bedroom.**
>
> **I came away from that home visit very . . . I feel very sorry for [the Johnsons]. For a year now, they have been given some visits. They have fallen in love with [L.J.]. I do not believe likewise they are capable of raising her.**
>
> **They have taken steps to make a bedroom. They have cleared out their little office thing. It's very small. It's okay. They bought a crib probably at a garage sale. They got a stroller. A car seat (sic). They have been given a court appointed attorney. Visits.**
>
> **My heart goes out to them. I feel they have been somewhat misled. Which (sic) they are going to be sad if they don't get custody.**
>
> **I still must sit here and say I don't feel they should get custody.**

Tr. 209-13. LCCSB presented no other witnesses.

{**¶13**} MacGillivray presented the testimony of two witnesses. Christa Oldiges ("Oldiges") was the case manager for Kenny at MRDD from 2001 to 2004. She testified that Kenny, who was an adult at the time, had been kicked out of the family home by his parents after several disagreements. Tr. 308. Once he was kicked out of the home, the Johnsons refused to act as his payee and returned

his money to social security indicating that a new payee needed to be found. Tr. 310. Oldiges had not ever been to current residence of the Johnsons and admitted that Kenny was sometimes difficult to deal with. Tr. 311-12. She thought "he was independent and had clear ideas about how he wants things done." Tr. 312.

{¶14} Liz Rose was the case worker before Oldiges, and worked with Kenny from 1994 until 2001. Tr. 315. She testified as follows.

> **Q. And how would you say, during the 7 years that he lived at home that you worked with him, the home, physical home situation was? We will start with the physical aspect of his living situation.**
>
> **A. The appearance of the home?**
>
> **Q. Appearance, condition, stability, cleanliness?**
>
> **A. I would say over those years, off and on, the family was in need of some financial assistance for various things. I would say, I guess the care of Kenny at that time probably would have been marginal, I guess. The physical condition of the home would have been probably, I guess marginal.**
>
> **Q. Would you say in your working with the family that his parents were extremely responsive to your efforts to improve their situation?**
>
> **A. I would say that Kenny's parents were open for help and accepting of that. But there were a lot of services and supports that I assisted with through those years.**
>
> **Q. That they willingly opened their arms and accepted? I am not sure I understand your answer?**
>
> **A. I would say at that time that we worked well together, but there were a lot of needs.**

* * *

**A.   I would say there was a consistent need for some assistance.**

Tr. 316-18.

{¶15} Following the conclusion of the hearing, the parties submitted written closing arguments to the trial court.  LCCSB filed its motion for an extension of temporary custody on September 18, 2008.  A hearing on that motion was set for October 7, 2008.  A case review was conducted on October 6, 2008, and filed with the court on October 8, 2008.  On October 24, 2008, the trial court entered its order granting the extension of temporary custody.

{¶16}  Another case review occurred on December 31, 2008, and was filed with the trial court on January 6, 2009.  The review indicated that Kenny and Ashley had not attended counseling since April of 2008, and that during a home visit on December 29, 2008, they had a verbal argument.  Ashley indicated that she wanted to move out.  The case worker noted that insufficient progress had been made on this requirement.

{¶17} On February 26, 2009, the trial court entered judgment granting permanent custody to LCCSB.  On March 2, 2009, the trial court entered a nunc pro tunc judgment entry correcting some errors in the original entry.  The Johnsons filed their notice of appeal from this judgment on March 23, 2009.  On

Case No. 8-09-07

March 27, 2009, Ashley filed her notice of appeal.[1]  Kenny filed his notice of appeal on March 30, 2009.  Kenny alleges the following assignment of error.

> **The trial court erred in granting permanent custody of the minor child to [LCCSB].**

The Johnsons raise the following assignment of error in their appeal.

> **The trial court erred by finding the evidence produced by [LCCSB] and the State of Ohio as clear and convincing, such that a grant of permanent custody of the minor child to [LCCSB] was warranted.**

{¶18} The right to raise one's own child is a basic and essential civil right. *In re Murray* (1990), 52 Ohio St.3d 155, 556 N.E.2d 1169.  "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6.  These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id.  When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414.  These requirements include in pertinent part as follows.

> **(B)(1)  Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child**

---

[1]   Ashley filed a notice of appeal, but failed to file a brief alleging an assignment of error.  However, she has not been formally dismissed from this appeal.

**to the agency that filed the motion for permanent custody and that any of the following apply:**

**(a)   The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \* \***

**(2) With respect to a motion made pursuant to [R.C. 2151.413(D)(1)], the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

**(C)   In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

**\* \* \***

**(D)(1)   In determining the best interest of a child at a hearing held pursuant to division (A) of this section \* \* \*, the court shall consider all relevant factors, including, but not limited to, the following:**

**(a)      The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-**

**home providers, and any other person who may significantly affect the child;**

**(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies \* \* \* for twelve or more months of a consecutive twenty-two-month period \* \* \*;**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

**\* \* \***

**(E) In determining at a hearing held pursuant to division (A) of this section \* \* \* whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines by clear and convincing evidence, at a hearing held pursuant to division (A) of this section \* \* \* that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**

**(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court**

**shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated within one year after the court holds the hearing pursuant to division (A) of this section * * *;**

**\* \* \***

**(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

**\* \* \***

**(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

**\* \* \***

**(16) Any other factor the court considers relevant.**

R.C. 2151.414.

{¶19} The trial court's judgment terminating parental rights are required to be supported by clear and convincing evidence. *In re Robinson Children*, 3d Dist. Nos. 5-07-26, 5-07-27, 5-07-28, 5-07-29, 5-07-30, 5-07-31, 5-07-32, and 5-07-33,

2008-Ohio-1139, ¶24. Thus, this court must determine whether the trial court's determination is supported by sufficient credible evidence to satisfy a higher degree of proof than a mere preponderance of the evidence. Id. If there is such evidence, this court must uphold the trial court's decision. Id.

{¶20} Kenny's assignment of error is that the trial court erred in terminating his parental rights. The case plan required Ashley and Kenny to 1) apply for services through MRDD, 2) cooperate and follow the recommendations of the service plans, 3) cooperate with the budgeting service, 4) sign releases for information, 5) have a home free of violence and police involvement, 6) attend counseling, and 7) participate in parenting classes. Ashley and Kenny complied with signing the releases, the budgeting services, and Kenny successfully completed the parenting class and applied the lessons during visits. They did not apply for services through MRDD except those offered through Champaign Residential Services, Inc. ("CRSI"). Ashley and Kenny did not follow through with the recommendations made by the caseworkers at CRSI. They moved out of public subsidized housing into a mobile home which they purchased for $200. The lot rent was much higher than their prior rental payment and the mobile home needed many repairs just to be habitable. When Kenny and Ashley separated, Kenny sold the mobile home for $100 and had to seek assistance to get the mobile home back after they reconciled.

{¶21} Ashley and Kenny have had a tumultuous relationship marked by frequent separations and reconciliations. During the case, they separated for three months.[2] When they argue, they frequently call the police to resolve their issues. Between May 5, 2007, and June 19, 2008, the police responded to 29 calls concerning Ashley and Kenny. The parties were referred for individual and marital counseling by LCCSB. Although they attended some of the counseling sessions, both Ashley and Kenny stopped attending counseling in April 2008.

{¶22} The failure to seek the services offered by MRDD had a negative effect on Kenny and Ashley. They refused to work with MRDD to obtain employment which would bring additional income to the home.[3] They did not utilize the services that would have helped them learn independent living skills such as cooking, cleaning, personal hygiene, and budgeting. The trial court noted that even after LCCSB filed for permanent custody, Kenny and Ashley did nothing to improve their situation and show their desire to have L.J. returned to them. In fact, the parents did less. Thus, the trial court could conclude that the parents were demonstrating a lack of commitment to L.J..

{¶23} Based upon the above competent, credible evidence, the trial court could reasonably conclude that Kenny and Ashley have not complied with the case

---

[2] Evidence in the record subsequent to the hearing indicates that Kenny and Ashley had again separated.
[3] The only income of the parties was social security disability payments and any money brought in by Kenny working odd jobs and scrapping metal.

plan and have thus "failed to remedy the conditions causing the child to be placed in foster care." R.C. 2151.414(E)(1),(4). Having made this finding, the trial court is required to make a finding that the children either cannot or should not be returned to their parents within a reasonable time. R.C. 2151.414(E). Once that finding is made, the trial court only needs to determine if granting permanent custody to LCCSB would be in L.J.'s best interest.

{¶24} R.C. 2151.414(D) requires the trial court to consider specific factors. The trial court considered the relationship of L.J. with her parents, foster parents, and other relatives. He found that L.J. had little bond with Ashley as Ashley generally acted as an observer during visits. Although L.J. played with Kenny, the trial court found that due to her age there was no significant bond with him. This despite the fact that both Ashley and Kenny made almost all of their visits, only missing due to illness. The trial court also found that due to L.J.'s limited visits with the grandparents and other relatives, there was no strong bonds with them. In contrast, the trial court noted that L.J. had developed a strong bond with her foster parents.[4] L.J. even suffered separation anxiety during visits and became fussy

---

[4] This attachment should be expected when an infant is taken from the hospital and placed with foster parents. L.J. only saw her biological parents for two hours per week and one hour of that time was shared with grandparents. The foster parents were with her the remaining hours of the week. Thus, it is natural that she would develop a strong relationship with them.

until reunited with the foster mother.[5]

{¶25} Due to L.J.'s young age, she was not able to express her own wishes. The GAL, acting on behalf of L.J., filed her report stating that, in her opinion, L.J. would prefer to remain with the foster parents. The child had spent her entire life with the foster parents. In comparison, L.J. had only spent approximately 27 hours with Ashley and Kenny since her birth. The trial court also determined that the foster parents were the only ones who could guarantee that L.J. have a permanent placement.

{¶26} The trial court considered all of the statutory factors and its findings were supported by competent, credible evidence. Based upon these factors, the trial court determined that granting permanent custody to LCCSB would be in L.J.'s best interest. Since both the finding that L.J. could not be placed with her parents within a reasonable time and that a grant of permanent custody to LCCSB was in L.J.'s best interest are supported by some competent and credible evidence, this court must affirm the judgment of the trial court. Kenny's assignment of error is overruled.

{¶27} The Johnsons' also claim that the trial court erred in granting permanent custody to LCCSB when they wished to have custody of their

---

[5] The trial court classified it as "attachment disorder." There was no testimony that there was an attachment disorder, only that the child was upset when separated from the foster mother. This is developmentally appropriate for a child of that age when separated from the primary caregiver and not the result of some underlying disorder.

granddaughter. Unlike the parents, grandparents do not have a fundamental right to raise their grandchildren and have no inherent legal rights based solely upon their family relationship. *In re H.W.*, 114 Ohio St.3d 65, 2007-Ohio-2879, ¶9, 868 N.E.2d 261.

> **[A] trial court is not required to consider placing a child with a relative prior to granting permanent custody to an agency. *In re Zoms*, [10th Dist.] No. 02AP-1297, 2003-Ohio-5664, ¶28. Relatives seeking custody of a child are not afforded the same presumptive legal rights that a parent receives. Id. A trial court does not even need to find by clear and convincing evidence that a grandparent is not a suitable placement option. *In re A.D.*, [8th Dist.] No. 85648, 2005-Ohio-5441, ¶12. Instead, it is within the trial court's discretion to determine whether to place children with a relative, such as grandmother.**

*In re J.S. et al.*, 10th Dist. Nos. 05AP-615, 05AP-616, 05AP-622, 05AP-623, 05AP-627, 05AP-628, 2006-Ohio-702, ¶34.

{¶28} Here, McClure testified that the Johnsons' home was inappropriate. The GAL also testified that the home was inappropriate because it was smoky. However MacGillivray did testify that the Johnsons' had purchased a crib and other necessary supplies and that the Johnsons' room, although small, would be appropriate for a baby. This court notes that McClure testified that the she had heard from other sources, such as MRDD, that the Johnsons had a history with LCCSB[6] and had issues cooperating with service providers. Interestingly, when

---

[6] No testimony was presented as to what this prior history was or what the outcome was. McClure just testified that she had heard about it.

one of the service providers for MRDD testified concerning her interactions with the Johnsons, she described them as needing financial help, but generally cooperative. All of the testimony was that the Johnsons behaved appropriately with L.J. during visits, made all of the visits, and loved the child. There also was no testimony that the Johnsons would not be able to parent L.J.. The general consensus was that they were too financially challenged to be granted custody and that the foster parents would be a better placement.

{¶29} If the standard of review were clear and convincing, this court could find that LCCSB had not met its burden of proof that L.J. should not be placed with the Johnsons. However, the standard of review is abuse of discretion. A review of the record indicates that there is some competent, credible evidence to support the judgment of the trial court. Thus, this court must affirm that judgment. The Johnsons' assignment of error is overruled.

{¶30} Having found no error with the judgment of the Court of Common Pleas of Logan County, the judgment is affirmed.

*Judgment Affirmed*

**PRESTON, P.J., Concurring in Judgment Only.**
**ROGERS, J., concurs.**
**/jlr**